JDN

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Kenneth Dale Gann, | ) | No. CV 08-8017-PCT-DGC (LOA) |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Dora Schriro, et al., | ) | |
| Defendants. | ) | |

Plaintiff Kenneth Dale Gann brought this civil rights action under 42 U.S.C. 1983 against Dora B. Schriro, former Arizona Department of Corrections (ADC) Director, and Richard Haggard, ADC Chief of Security at the Arizona State Prison Complex (ASPC)-Winslow Kaibab Unit (Doc. #1). Before the Court is Defendants' Motion for Summary Judgment (Doc. #16), which is fully briefed (Doc. ##19-20). The Court will grant Defendants' motion and terminate the action.

**I.    Background**

In his Complaint, Plaintiff claimed that for years he requested protective segregation (PS) for protection from other inmates, but his requests were all denied and, instead, he was transferred to alternative housing units (Doc. #1 at 3). Plaintiff alleged that when he arrived at the ASPC-Kaibab Unit, he was confronted with the same inmates from whom he had sought protection (id.). Plaintiff averred that he requested PS again and was placed in lock down. He alleged that after one week in detention, he was ordered to general population, and after initially going on to the general population yard, he had to request PS (id.). Plaintiff

stated that the movement officer responded by verbally assaulting Plaintiff and issuing him a disciplinary ticket (for which he was later found not guilty). Plaintiff alleged that shortly thereafter, on November 7, 2007, Haggard ordered him to the general population yard despite the likelihood that Plaintiff would be assaulted or killed (id. at 3). Plaintiff stated that he refused to go to the yard. Plaintiff alleged that Haggard ordered him to general population again a week later and Plaintiff again refused (id. at 3-A). Plaintiff was issued major disciplinary tickets for his two refusals to go to yard (id.). He asserted that he was forced to choose between his safety and more prison time and loss of privileges (id.). Plaintiff claimed that the order to transfer to general population was pursuant to a broader policy set by Schriro (id.). He claimed that Defendants' actions violated his Eighth Amendment rights (id. at 6).[1]

Plaintiff sued for injunctive relief and monetary damages (id.). After initiating this action, Plaintiff was transferred out of the Kaibab Unit and ultimately placed on a sex offender yard (Doc. #17, Ex. D, Matson Decl. ¶ 39). Plaintiff was released from prison in the fall of 2009 (Doc. #24). Consequently, his request for injunctive relief is moot and the only remaining claim is for damages.

## II.  Summary Judgment Standard

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

---

[1] The Court dismissed those allegations within Count I regarding Plaintiff's April and October 2007 requests for PS that were denied (Doc. #3 at 3). The Court also dismissed Count II, which concerned conditions-of-confinement including triple-celling and limited recreation and showers (id. at 4).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 250; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Rule 56(e) compels the non-moving party to "set out specific facts showing a genuine issue for trial" and not to "rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). But Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. Celotex, 477 U.S. at 322-23.

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. If the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. Id. at 249-50.

**III. Motion for Summary Judgment**

    **A. Facts**

In support of their motion, Defendants submit a separate Statement of Facts (DSOF), much of which focuses on the PS review process, which is governed by Director's Instruction (DI)-67—PS Policy, and Plaintiff's requests for PS from 2005-2007 (Doc. #17). In its Screening Order, the Court determined that Plaintiff's allegations claiming that he was

unlawfully denied PS, in particular in April and October 2007, failed to state a claim because Plaintiff did not link a named Defendant to these allegations (Doc. #3 at 3). The only allegations found to state a constitutional claim were Plaintiff's allegations that after his transfer to Kaibab, on November 7, 2007, and again one week later, Haggard ordered him to be transferred to general population despite knowledge of the risk of harm to Plaintiff's safety and that the transfer order was in accordance with a policy established by Schriro (see Doc. #3 at 3-4). The Court will summarize those facts that provide the background to this remaining claim. That said, the following facts, except as otherwise noted, are undisputed.

### *1. DI-67—Protective Segregation Policy*

The DI-67 process is a documented review of an inmate's need for long-term PS placement (DSOF ¶¶ 6, 12). Alternatives to PS placement include a transfer to a different unit away from inmates who have been identified as threats, or a transfer to a unit specifically designated for vulnerable inmates, such as convicted sex offenders (id. ¶¶ 9-11).

The DI-67 process is triggered by an inmate's request for PS (id. ¶ 12). Officials isolate and interview the inmate and complete various PS documents, which are forwarded to the Deputy Warden, who reviews the documents and determines whether a full DI-67 process is required (id. ¶¶ 12, 16-17). If a full PS review is required, the Criminal Investigation Unit (CIU) conducts a more complete investigation and then sends its report back to the Deputy Warden (id. ¶¶ 15-16, 19-20, 27). The Deputy Warden determines whether there exists a verifiable threat and makes a recommendation, which is forwarded to the Warden (id. ¶ 29). The Warden either endorses the Deputy Warden's recommendation, orders further CIU investigation, or makes a different recommendation (id. ¶ 30).

The final decision on PS placement rests with the PS Committee, which reviews the recommendations and documents and then approves or denies PS placement, and, if necessary, transfers the inmate to alternate housing (id. ¶ 31).

### *2. Plaintiff's History*

Plaintiff was convicted of two attempted sex crimes in 1979 as a juvenile (Doc. #19 at 2). He was sentenced to prison after violating probation (id.). Because he was a sex

offender, he was placed on PS yards in 1986-87 and again in 1992 (id.). In 1997, he was housed on a sex-offender yard (id.). In 1999, he registered with the state as a sex offender. The next year, he pled guilty to failure to change address as a sex offender (id.). Plaintiff was housed on a sex-offender yard from 2001-2004 (id.). In 2004, the ADC determined that Plaintiff no longer fit the criteria for sex-offender yard placement and he was released to general population (id.).

Plaintiff requested PS placement in June 2005, and October 2006 (DSOF ¶¶ 35-36). A full DI-67 process was initiated upon each of those requests. In both cases, the Deputy Warden and Warden recommended that PS be denied and the PS Committee denied PS (id.). In each case, Plaintiff was transferred to alternate housing (id.).

The second transfer resulted in Plaintiff arriving at the Douglas Mojave Unit on April 3, 2007 (id.). The next day, Plaintiff was assaulted by two inmates (id. ¶ 37; Doc. #19 at 1-2). Plaintiff requested PS and the DI-67 process was initiated (DSOF ¶ 37; Doc. #19 at 2). During the investigation, officials interviewed Plaintiff about a letter that was intercepted from a maximum custody unit and that contained information potentially threatening to Plaintiff (Doc. #19 at 2). At the conclusion of the DI-67 investigation, both the Deputy Warden and the Warden recommended PS placement (DSOF ¶ 37; Doc. #19 at 2). But the PS Committee denied PS and instead approved alternate placement (id.). Plaintiff appealed this decision. On September 18, 2007, the final appeal was denied, and a month later—on October 17—Plaintiff was transferred to ASPC-Winslow Kaibab Unit (Doc. #19 at 2).

### *3. Kaibab Unit*

Upon his arrival at the Kaibab Unit, Plaintiff immediately requested PS (DSOF ¶ 40). He was placed into detention and his statement was taken and documented on an Information Report form (id.). Plaintiff also provided a written statement (id.).

When a PS request is made within 30 days of a DI-67 process, as was the case here, instead of instituting a new DI-67 process, the unit's Deputy Warden and the PS coordinator are responsible for reviewing the previous PS file and providing a summary of any new information to the PS Administrator at the Central Office, who then advises how to proceed

(id. ¶¶ 40-41). If the information justifies a renewed PS request, a DI-67 process is re-initiated (id. ¶ 41).

Plaintiff states that his October 17 statement provided notice of a threat (Doc. #19 at 6). He states that the day he arrived at Kaibab, he saw inmates he had known at other units and he was told by them that "you have to bounce" (id.). He further states that "word spread like wild fire that a S.O. [sex offender] was on the yard" (id.).

According to Defendants, on October 19, 2007, Officer Haley, the previous PS Administrator, reviewed Plaintiff's PS request and reported back to the Kaibab Unit that there was no verifiable threat and Plaintiff should remain in general population (DSOF ¶ 42; see Doc. #19, Attach. at 1).

On October 24, 2007, Plaintiff was returned to the general population yard. Upon his arrival on the yard, he immediately contacted an officer and refused to remain on the yard (id. ¶ 44). Plaintiff was interviewed. Defendants state that he refused to give a reason why his life was in danger, he did not state that he was threatened, and he did not identify anyone who made a threat to him (id.). Plaintiff states that on October 24, the movement officer verbally assaulted Plaintiff and that this verbal assault referenced Plaintiff's safety on the yard (Doc. #19 at 3). The next day, Plaintiff filed an inmate letter about his safety on the yard and the officer's verbal assault (id.; Doc. #17, Ex. 2, Attach. 2). He wrote that he felt that his life was in danger, and he referred to his prior assault at the Douglas Mojave Unit (id.). He also wrote that the movement officer yelled "you're a piece of shit, the scum of the earth, I would love nothing more than to drag your ass out to the yard and help them beat the crap out of you" (id.). A copy of this grievance was sent to Haggard (id.). Because Plaintiff refused to go to the yard, he was placed into detention (id.).

On November 7, 2007, Haggard attended the Kaibab Unit Detention Bed Meeting, where Haggard, the Deputy Warden, and the unit's Correctional Officer (CO) IV reviewed each inmate in detention. They determined that Plaintiff was appropriately classified to general population (DSOF ¶ 45). Defendants state that in light of the previous DI-67 process and the lack of any new information, Haggard ordered Plaintiff's return to the yard (id.).

Plaintiff refused to return to the yard (id.). Defendants state that he would not explain why he refused to return to the yard (id. ¶ 46). Haggard placed him on disciplinary report for refusing a direct order, and Plaintiff remained in detention (id.).

Also on November 7, Plaintiff filed an inmate grievance stating that Haggard was trying to get him killed by ordering him to return to general population despite knowledge of an obvious risk of harm (id. ¶ 52).

The next week, on November 15, at another Kaibab Unit Detention Bed Meeting, Haggard, the Deputy Warden, and the CO IV determined that Plaintiff was appropriately classified to general population (id. ¶ 47). Haggard again ordered that Plaintiff be returned to the yard (id.). Defendants state that Plaintiff again refused and would not explain why (id. ¶ 48). Haggard placed him on disciplinary report and kept him in detention (id.).

Plaintiff remained in detention until May 19, 2008, when he was transferred to ASPC-Tucson Santa Rita Unit (id. ¶ 49; Doc. #17, Ex. A, Adult Information Management System (AIMS) report at 6). Then, on December 26, 2008, Plaintiff requested to be moved to a sex offender yard; four days later he was moved to a sex offender yard (id. ¶ 49).

In September 2009, Plaintiff was released from prison (Doc. #24).

**B.     Parties' Contentions**

*1. Defendants' Motion*

Defendants seek summary judgment on the grounds that (1) they did not violate Plaintiff's Eighth Amendment rights, (2) the monetary claims against them in their official capacity are barred by the Eleventh Amendment, and (3) there is no evidence to support punitive damages (Doc. #16 at 10).

Defendants argue that Schriro cannot be liable under a theory of respondeat superior and that Plaintiff offers only conclusory allegations that her policy placed him in danger (id. at 7-8). Defendants maintain that Plaintiff has not shown that Schriro knew that the DI-67 policy placed inmates at serious risk or that she disregarded such a risk (id. at 8). They assert that Plaintiff appears to complain about the policy's results rather than the policy itself (id.). Defendants further assert that Schriro delegated all responsibilities related to the PS policy

1  and, therefore, she had no involvement in Plaintiff's PS review, housing assignments, or
2  orders to return to general population (id.).

3  Defendants contend that Haggard was not involved in any of Plaintiff's PS requests
4  (id. at 9). Defendants explain that Haggard's only involvement was at the Kaibab Unit
5  following the November 2007 Detention Bed Meetings, at which time Haggard ordered
6  Plaintiff's return to general population (id.). Defendants maintain that Haggard's orders were
7  justified because Plaintiff had just been through the DI-67 process and when Haggard
8  ordered Plaintiff back to the yard, Plaintiff did not provide any new information that would
9  justify a new PS request or suggest that Plaintiff was in danger (id.). Thus, Defendants argue
10 that Haggard did not know of and disregard any risk to Plaintiff and Haggard was fulfilling
11 his responsibility to return Plaintiff to the yard (id.). Defendants argue that unsubstantiated
12 claims of danger or a generalized fear of harm are insufficient to support a finding of
13 deliberate indifference to a substantial risk of harm (id.).

14 Next, Defendants contend that because the Eleventh Amendment bars suits for
15 monetary damages against a state official in his official capacity, any claims for monetary
16 damages brought by Plaintiff against Defendants in their official capacity must be dismissed
17 (id. at 10).

18 Finally, Defendants argue that even if the Court finds that a triable issue of fact exists,
19 Plaintiff's claim for punitive damages must be dismissed because there is no evidence that
20 Defendants acted with evil motive or callous indifference, which is required to support a
21 punitive damages award (id.).

22 In support of their motion, Defendants submit a copy of Plaintiff's AIMS report (Doc.
23 #17, Ex. A), excerpts from Plaintiff's deposition (id., Exs. B, E, Pl. Dep., Sept. 30, 2008),
24 and the declarations of each Defendant, PS Administrator Hugh Matson, and Kaibab Unit
25 Deputy Warden Ernie Garcia (id., Exs. C-D, F-G). Attachments to these declarations include
26 copies of Plaintiff grievances and the responses thereto (id., Ex. C, Attachs. 1-6) and a copy
27 of the DI-67 policy (id., Ex. D, Attach. 1).

28

### *2. Plaintiff's Response*[2]

Plaintiff opposes Defendants' motion (Doc. #19). He argues that Defendants' claim that Schriro is not liable because she did not have an affirmative role in the constitutional deprivation fails because under state law, the ADC Director is responsible for all operations and policies of the department (id.). Plaintiff asserts that her statutory duty to create policies and delegate responsibility for those policies establishes her direct participation, by way of employee acts and omissions, in the deprivation of constitutional rights (id. at 3).

Plaintiff argues that Haggard was aware of the previous PS review and recommendations for PS placement, but he chose to disregard that information (id. at 4). Plaintiff disputes that Haggard did not have any new information to support PS placement (id. at 4-5). Plaintiff argues that verbal and written statements made on October 17 and 24 provided notice of a threat to his safety. Plaintiff argues that Haggard was reckless and acted with deliberate indifference to these new threats to Plaintiff's safety (id. at 5).

As to Defendants' claim that Plaintiff could not identify a specific threat to justify PS placement, Plaintiff points to a provision in the DI-67 policy that states that ADC staff, when making their decision on placement, should consider "that there may be some situations in which an inmate cannot identify a specific individual who presents a threat" (id. at 5-6, citing DO 805.01 § 1.1.1). Plaintiff cites to another provision that instructs staff to recognize "that there may be some situations in which an inmate has been so thoroughly identified as a protection case as to be unable to function in [general population]" (id. at 6, citing 805.02 § 1.1).

Plaintiff maintains that there was more than a "generalized fear of harm," and that his threat-to-safety claim was substantiated by the Warden's and Deputy Warden's recommendations for PS placement just a few month prior to the October 2007 Kaibab placement (id. at 5). He also asserts that Deputy Warden Garcia and Assistant Deputy Warden Morales attempted to stymie the grievance process to protect Haggard and cover-up

---

[2]The Court issued a Notice pursuant to Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), informing Plaintiff of his obligation to respond (Doc. #18).

Plaintiff's complaints against Haggard (id. at 7-8).

With respect to Defendants' Eleventh Amendment argument, Plaintiff contends that this defense was not raised in Defendants' Answer and is therefore waived (id. at 9). He also asserts that his allegations must be construed liberally so the Court should construe his claims as against Defendants both in their official capacity and their individual capacity (id. at 10).

In support of his opposition, Plaintiff proffers copies of the October 24, November 7, and November 15 disciplinary reports, and copies of 2008 inmate letters (id., Attachs.).

### *3. Defendants' Reply*

In their reply, Defendants argue that Plaintiff failed to comply with the Federal and Local Rules of Procedure because he did not submit admissible evidence to support his opposition and he did not set forth facts responding to the DSOF (Doc. #20). Defendants submit that all of the DSOF should therefore be deemed admitted (id. at 2).

Defendants also contend that Plaintiff cannot rely on state law to support liability for Schriro because respondeat superior is not available under § 1983 (id.). As to Haggard, Defendants argue that there is no evidence that there was a "sufficiently serious" constitutional deprivation or that Haggard acted with deliberate indifference to Plaintiff's safety (id.). Defendants maintain that the fact that a copy of Plaintiff's October 25 grievance was sent to Haggard does not establish that Haggard was involved (id. at 2). Defendants reassert that Haggard's only involvement with Plaintiff was participation in the two November 2007 Weekly Detention Bed Meetings and the subsequent orders for Plaintiff to return to general population based on a DI-67 process in the previous 30 days and the lack of any new information to justify a renewed PS request (id. at 3).

**IV.    Analysis**

    **A.    Procedural**

Initially, the Court will deny Defendants' request that the DSOF be deemed admitted due to Plaintiff's failure to comply with the Rules of Procedure. Plaintiff's response memorandum sufficiently establishes disputes with Defendants' Statement of Facts. In light of Plaintiff's *pro se* status and the requirement to construe his pleadings liberally and afford

him the benefit of any doubt, the Court will consider his response. Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 623 (9th Cir. 1988); see also Haines v. Kerner, 404 U.S. 519, 520-21 (1972). Further, because Plaintiff's Complaint is verified, based on personal knowledge, and sets forth specific facts admissible in evidence, it is used as an affidavit opposing summary judgment. Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995).

**B.     Schriro**

There is no *respondeat superior* liability under § 1983, and, therefore, a defendant's position as the supervisor of persons who allegedly violated a plaintiff's constitutional rights does not impose liability. Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 691-92 (1978); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). To prevail on a claim against a supervisory official, the plaintiff must demonstrate that the supervisory official (1) personally participated in the constitutional deprivation, (2) was aware of widespread abuses and, with deliberate indifference to the plaintiff's constitutional rights, failed to take action to prevent further misconduct, or (3) promulgated a policy so deficient that it is a repudiation of a constitutional right and the moving force of the violation. See Mackinney v. Nielsen, 69 F.3d 1002, 1008 (9th Cir. 1995); Ortez v. Washington County, 88 F.3d 804, 809 (9th Cir. 1996); Taylor, 880 F.2d at 1045; King v. Atiyeh, 814 F.2d 565, 568 (9th Cir. 1987).

Here, Plaintiff does not allege that he had any actual contact with Schriro or that she personally participated in the events at the Kaibab Unit. There is no evidence that Schriro knew of Plaintiff's October 17 request for PS or of the subsequent orders to return to the general population yard. Although Plaintiff's October 25 grievance was appealed to the Director's level, Schriro avers that she delegated authority to address the appeal to Susan Rogers, ADC General Counsel, and an appeals officer, both of whom signed the appeal response (Doc. #17, Ex. C, Schriro Decl. ¶ 9, Attach. 6). Plaintiff does not challenge this statement.

Instead, Plaintiff relies on Schriro's liability as the person who established ADC policy. But Plaintiff submits no facts suggesting that the DI-67 policy was deficient. Indeed,

he relies on specific provisions in the DI-67 policy to support his claim against Haggard (see Doc. #19 at 5-6). More importantly, the remaining claim—related to Haggard's November orders to return to the yard—is not directly tied to the DI-67 policy or any other identified policy. Plaintiff submits only general allegations that Haggard's orders were pursuant to policy and he fails to provide any facts showing that a policy was the cause of the alleged deprivation. Consequently, there is no triable issue of fact as to Schriro's liability. She will be granted summary judgment and the claims against her will be dismissed.

### C. Haggard

Unlike his claim against Schriro, Plaintiff sets forth facts alleging Haggard's personal participation in the alleged deprivation (see Doc. # 1 at 3-4). See Rizzo v. Goode, 423 U.S. 362, 370-71, 375-77 (1976). The Court must therefore analyze the Eighth Amendment damages claim against Haggard under the deliberate indifference standard set out in Farmer v. Brennan, 511 U.S. 825, 837 (1994).

The Eighth Amendment requires prison officials to protect prisoners from violence at the hands of other prisoners. Id. at 833. When prison officials transfer an inmate who alleges that his well-being will be in jeopardy, their action constitutes an Eighth Amendment violation only if it can be shown that prison "officials acted with 'deliberate indifference' to the threat of serious harm or injury by another prisoner." Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986) (citations omitted); see also Redman v. County of San Diego, 942 F.2d 1435, 1449 (9th Cir. 1991) (en banc). The decision to transfer must display "deliberate indifference" to the inmate's personal security. See Redman, 942 F.2d at 1449. To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer, 511 U.S. at 837. Therefore, to establish a violation, a prisoner must first satisfy an objective requirement—he must show that he has been transferred into "conditions posing a substantial risk of serious harm." Id. at 845. Then, he must satisfy a subjective requirement—he must show that the defendant was aware of the risk and disregarded the

risk. Farmer, 511 U.S. at 834, 837.

An inmate need not wait until he is actually assaulted to bring an Eighth Amendment claim. See Farmer, 511 U.S. at 845. Farmer did not address the point at which a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes. Id. at 834 n. 3. But the Ninth Circuit has found that the "mere threat" of future bodily harm to a prisoner may not provide a basis for a cognizable Eighth Amendment claim. See Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987).

In this case, to demonstrate deliberate indifference, Plaintiff must first show that Haggard's orders on November 7 and 15, for Plaintiff to be transferred to the general population yard, placed Plaintiff in conditions posing a substantial risk of serious harm. The record shows that after Haggard issued orders to go to the yard, Plaintiff was never removed from detention; thus, he was not placed into a situation that posed a substantial risk of harm. Had Plaintiff been transferred to the yard pursuant to one of Haggard's orders, he would have been subject to a serious threat of harm, regardless of whether he was actually assaulted. But Haggard's orders were never brought to fruition because Plaintiff was able to refuse them and remain in detention. The DI-67 policy provides that even if there is no information supporting PS placement, "staff shall never force an inmate into general population" (Doc. #17, Ex. D, Attach. 1 at 1). Plaintiff's individual claim for damages against Haggard is based solely on his fear that he *might* have been transferred into general population, even though his transfer could be prevented by provisions within the DI-67 policy and, in fact, was prevented.

Similar facts are presented in Babcock v. White, where the plaintiff was threatened by members of the Mexican Mafia and refused to enter the general population. 102 F.3d 267, 269-70 (7th Cir. 1996). As a result, he was placed in administrative detention. He continued to receive threats, so he sought a transfer to a facility free of Mexican Mafia members. Id. at 269. He was housed in administrative segregation for ten months until his transfer to another facility. Id. at 270. Because he remained in segregation, the danger that the plaintiff feared—attacks by Mexican Mafia members—never materialized. Id. The Seventh Circuit

concluded that the plaintiff's claim of psychological injury did not constitute a deprivation of "the minimal civilized measures of life's necessities." Id. at 272 (citations omitted). The Court stated that the plaintiff did not allege a failure to prevent harm, but rather a failure to prevent exposure to the risk of harm, which did not entitle him to monetary compensation. Id. at 271-272 (citing Farmer v. Brennan, 511 U.S. at 834; Carey v. Piphus, 435 U.S. 247, 258-59 (1978)). "[I]t is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eighth Amendment." Babcock, 102 F.3d at 272 (internal citation omitted).

The Court emphasizes that in the instant action, Plaintiff's claim is limited to Haggard's orders to return to the yard on November 7 and 15. Although Plaintiff was placed on the yard on October 24, and was thereby potentially subject to a serious threat of harm, his allegations demonstrate that he was not forced onto the yard on that date; rather, he "gave it a try," but had to request PS again (Doc. #1 at 3). Further, he does not allege that Haggard was involved in the October 24 placement—only that Haggard became aware of the October 24 incident through a subsequent inmate letter (Doc. #19 at 4).

As stated, Plaintiff need not wait until he is actually assaulted to establish an Eighth Amendment claim, but he must proffer some evidence from which a reasonable person could infer that he was, in fact, exposed to an objectively intolerable risk of harm. The Court finds that he has failed to do so. To the extent that Plaintiff alleges that he was subject to loss of privileges and a loss of good time credits as a result of the disciplinary write-ups for refusing Haggard's orders, that "harm" is insufficient to support his Eighth Amendment claim for damages. In his Complaint, Plaintiff claimed that he suffered "loss of good time, loss of privileges, store, T.V. and radio" (Doc. #1 at 3). But in his response, he does not elaborate on the good time credits he lost nor does he describe the extent of the privileges he lost or for how long. See Celotex, 477 U.S. at 324 (party opposing summary judgment "must go beyond the pleadings and ... designate specific facts showing" a material factual dispute). As such, he failed to provide any specific facts or evidence to support an inference that the loss of privileges or the conditions in detention rose to a level that constituted an objectively

1  serious risk of harm or amounted to a deprivation of "the minimal civilized measures of life's
2  necessities." Wilson v. Seiter, 501 U.S. 294, 298 (1991) ("only those deprivations denying
3  'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis
4  of an Eighth Amendment violation") (internal citation omitted).[3]

Taking all of his allegations as true, Plaintiff was subjectively fearful that he would be transferred into general population. As much as the Court questions Haggard's orders to return Plaintiff to general population, Plaintiff remained in detention and was never actually placed in harm's way. Consequently, Plaintiff was not exposed to a serious risk of harm and he cannot satisfy the objective requirement of the deliberate indifference test. The Court need not proceed to the second, subjective, element in the deliberate indifference analysis. Nor does the Court need to address Defendants' remaining arguments for summary judgment. Haggard will be granted summary judgment, and the Complaint will be dismissed with prejudice.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. #16).

(2) Defendants' Motion for Summary Judgment (Doc. #16) is **granted**.

(3) Plaintiff's Complaint is dismissed, and the Clerk of Court must enter judgment accordingly.

DATED this 16th day of November, 2009.

*David G. Campbell*
David G. Campbell
United States District Judge

---

[3] In his Complaint, Plaintiff also alleged that he suffered mental pain and anguish, but these alleged injuries appear to apply to the claims in Count II that were dismissed (see Doc. #1 at 3-4). Regardless, Plaintiff did not address these injuries in his response memorandum and therefore failed to provide any specific evidence or facts to show that his mental pain was sufficient to support an Eighth Amendment claim.